UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| THERESA W., | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) 1:20-cv-00308-LEW |
| | ) |
| KILOLO KIJAKAZI,[1] Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant | ) |

# REPORT AND RECOMMENDED DECISION

On Plaintiff's application for disability insurance benefits under Title II of the Social Security Act, Defendant, the Social Security Administration Commissioner, found that Plaintiff has severe impairments but retains the functional capacity to perform substantial gainful activity. Defendant, therefore, denied Plaintiff's request for disability benefits. Plaintiff filed this action to obtain judicial review of Defendant's final administrative decision pursuant to 42 U.S.C. § 405(g).

Following a review of the record, and after consideration of the parties' arguments, I recommend the Court vacate the administrative decision and remand the matter for further proceedings.

## THE ADMINISTRATIVE FINDINGS

The Commissioner's final decision is the November 7, 2019 decision of the

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi is substituted as the defendant in this matter.

Administrative Law Judge. (ALJ Decision, ECF No. 13-2).[2] The ALJ's decision tracks the familiar five-step sequential evaluation process for analyzing social security disability claims, 20 C.F.R. § 404.1520.

The ALJ found that as of December 31, 2017, the date last insured, Plaintiff had severe, but non-listing-level impairments consisting of degenerative disc disease of the lumbar spine and status post left and right shoulder arthroscopies. (R. 17.) The ALJ further found that as the result of the impairments, Plaintiff had a residual functional capacity (RFC) to perform less than the full range of light work, limiting her to lifting and/or carrying up to 10 pounds frequently and up to 20 pounds on occasion, pushing and/or pulling up to 10 pounds frequently, sitting for up to six hours in an eight-hour workday, and standing and/or walking for up to six hours; and she also could occasionally crawl, crouch, kneel, stoop, and climb stairs, ramps, ladders, ropes, and scaffolds; could occasionally reach overhead but must avoid concentrated exposure to heights, vibrations and vibratory tools; and requires three to five minutes once an hour to change positions to relieve pressure on the muscles and joints. (R. 21-22.)

Based on the RFC finding, the ALJ concluded that Plaintiff could return to her past relevant work as a cashier checker. (R. 27.) In the alternative, the ALJ found that Plaintiff could perform other substantial gainful activity, including the specific representative jobs of merchandise marker, inspector and hand packager, and storage facility rental clerk. (R. 27-28.)

---

[2] Because the Appeals Council found no reason to review that decision (R. 1), Defendant's final decision is the ALJ's decision.

## STANDARD OF REVIEW

A court must affirm the administrative decision provided the decision is based on the correct legal standards and is supported by substantial evidence, even if the record contains evidence capable of supporting an alternative outcome. *Manso-Pizarro v. Sec'y of HHS*, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam); *Rodriguez Pagan v. Sec'y of HHS*, 819 F.2d 1, 3 (1st Cir. 1987). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a finding. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Sec'y of HHS*, 647 F.2d 218, 222 (1st Cir. 1981). "The ALJ's findings of fact are conclusive when supported by substantial evidence, but they are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999).

## DISCUSSION

Plaintiff contends that the ALJ erred (1) at step 2, by failing to find as severe impairments Plaintiff's fibromyalgia and depression, and (2) in assessing Plaintiff's RFC.

**A.  Step 2**

At step 2 of the sequential evaluation process, a social security disability claimant must establish the alleged conditions are severe, but this burden is de minimis, and is designed merely to screen out groundless claims. *McDonald v. Sec'y of HHS*, 795 F.2d 1118, 1123-24 (1st Cir. 1986). The ALJ may find that an impairment or combination of impairments is not severe when the medical evidence "establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work

experience were specifically considered." *Id.* at 1124 (quoting Social Security Ruling 85-28). In other words, an impairment is severe if it has more than a minimal impact on the claimant's ability to perform basic work activities on a regular and continuing basis. *Id.*

At step 2, medical evidence is required to support a finding of severe impairment. 20 C.F.R. § 404.1521. *See also* Social Security Ruling 16-3p, 2017 WL 5180304, at *3 ("An individual's symptoms, such as pain, fatigue, shortness of breath, weakness, nervousness, or periods of poor concentration will not be found to affect the ability to do basic work-related activities for an adult … unless medical signs or laboratory findings show a medically determinable is present.") A diagnosis, standing alone, does not establish that the diagnosed impairment would have more than a minimal impact on the performance of work activity. *Dowell v. Colvin*, No. 2:13-cv-00246-JDL, 2014 WL 3784237, at *3 (D. Me. July 31, 2014). Moreover, even severe impairments may be rendered non-severe through the ameliorative influence of medication and other forms of treatment. *Parsons v. Astrue*, No. 1:08-cv-218-JAW, 2009 WL 166552, at *2 n.2, *aff'd*, 2009 WL 361193. In addition, an impairment must meet the 12-month durational requirement in order to be considered "severe." 20 C.F.R, § 404.1509; *Mulero v. Comm'r of Soc. Sec.*, 108 F. App'x 642, 644 (1st Cir. 2004) (to be severe, impairment must satisfy durational requirement).

If error occurred at step 2, remand is only appropriate when the claimant can demonstrate that an omitted impairment imposes a restriction beyond the physical and mental limitations recognized in the Commissioner's RFC finding, and that the additional restriction is material to the ALJ's "not disabled" finding at step 4 or step 5. *Socobasin v. Astrue,* 882 F. Supp. 2d 137, 142 (D. Me. 2012) (citing *Bolduc v. Astrue,* No. 09–CV–220–

B–W, 2010 WL 276280, at *4 n. 3 (D. Me. Jan. 19, 2010) ("[A]n error at Step 2 is uniformly considered harmless, and thus not to require remand, unless the plaintiff can demonstrate how the error would necessarily change the outcome of the plaintiff's claim.")).

### 1. Fibromyalgia

Plaintiff alleges that her severe impairments include fibromyalgia. The ALJ identified and discussed the three criteria that must be satisfied to support a finding that Plaintiff's claimed fibromyalgia is a medically determinable impairment under Social Security Ruling 12-2p, 2012 WL 3104869. (R. 19.) The criteria, derived from the 2010 American College of Rheumatology Preliminary Diagnostic Criteria, are: (1) a history of widespread pain; (2) repeated manifestations of six or more fibromyalgia symptoms, signs or co-occurring conditions; and (3) evidence that other disorders that could cause the repeated manifestations of symptoms, signs or co-occurring conditions were excluded. (*Id.*)

While noting that Plaintiff "reports some signs and symptoms, such as widespread joint pain," the ALJ found that "there is no evidence supporting a finding that [fibromyalgia] is a diagnosis of exclusion …." (*Id.*) When assessing Plaintiff's RFC, the ALJ wrote that she gave "great weight" to the opinions of the state agency medical consultants, Archibald Green, D.O., and Paul Schraeder, M.D., neither of whom listed fibromyalgia as one of Plaintiff's medically determinable impairments and both of whom noted that Plaintiff's fibromyalgia symptoms were "controlled with medication," and that Plaintiff had no limitations due to the condition. (R. 25; 99, 103, 115, 120.)

After the state agency consultants' review of her medical records, Plaintiff saw rheumatologist Jalal Mukhtar, M.D., who diagnosed Plaintiff with fibromyalgia and noted in his report:

> Her recent autoimmune panel was negative for rheumatoid factor, antinuclear antibody, Lyme antibody screen. Sed rate and CRP were also normal. On my exam today I am not seeing any clinical evidence to suggest rheumatological/autoimmune arthritis. Her pain is primarily from fibromyalgia. Diffuse pain index is 16, symptom severity score is at least 7. This will go with the diagnosis of fibromyalgia, especially in absence of any clinical evidence to suggest synovitis.

(R. 688.)

The ALJ summarized the examination findings of Dr. Mukhtar as follows:

> [Plaintiff] complained of body pain, fatigue, numbness, tingling, and abdominal pain, which she said was attributable to a history of fibromyalgia. Dr. Mukhtar noted that [Plaintiff] had no history of autoimmune arthritis and laboratory testing resulted in negative or normal rheumatoid factor, ANA, Lyme antibody screen, sedimentation rate and CRP findings. A review of radiology reports revealed multiple levels of "DJD" changes in the spine, but xrays [sic] of the hips revealed "no significant DJD." A physical examination identified normal range of motion in the neck, normal effort in the chest, no tenderness of the abdomen, normal gait and "no swelling, synovitis, redness, warmth in DIP, PIP, CP, wrists, elbows, knees, ankles and toes." Dr. Mukhtar wrote that there was "pressure point tenderness over the elbows, costochondral joints, trapezium, back of neck, paraspinal area around the shoulder blades, ankles, and knees."

(R. 18-19.) The ALJ recognized that Dr. Mukhtar assessed Plaintiff's pain as primarily from fibromyalgia and noted that Dr. Mukhtar recommended low impact exercise and good sleep hygiene to reduce the triggers. (R. 16.)

In her assessment of whether Plaintiff's claimed fibromyalgia was a medically determinable impairment, the ALJ wrote that "there is no evidence supporting a finding that [fibromyalgia] is a diagnosis of exclusion," and "[m]ost important[ly], the claimant

6

has been treated for bilateral shoulder rotator cuff tears, impingement syndrome and adhesions, as well as left knee osteoarthritis and lumbar spondylosis, which could reasonably cause her pain complaints which were addressed by surgery." (R. 19.)

Plaintiff first argues that there is no medical evidence to support the ALJ's conclusion. Expert medical evidence, however, is not required for an ALJ to determine whether an alleged impairment constitutes a severe medically determinable impairment. *See Small v. Colvin*, No. 2:14-cv-042-NT, 2015 WL 860856, at *7 (D. Me. Feb 27, 2015). *See also, e.g., Chretein v. Berryhill*, No. 1:16-cv-00549-JAW, 2017 WL 4613196, at *6 (D. Me. Oct. 15, 2017) (rec. dec. aff'd, Mar. 20, 2018) (expert opinion critical for "assessment at Step 4 of a claimant's RFC, not assessment at Step 2 of whether an impairment is severe"). In any event, neither of the state agency medical consultants, both of whom were aware of Plaintiff's fibromyalgia claim, listed it as a medically determinable impairment and both noted that Plaintiff's symptoms were well-controlled by medication. The ALJ's step 2 determination is supported by the state agency opinions and the record evidence.

Even if the ALJ's finding that Plaintiff's fibromyalgia is not a medically determinable impairment was erroneous, Plaintiff has not shown how her fibromyalgia results in any functional limitations beyond those assessed by the ALJ. *See, e.g., Carlton v. Soc. Sec. Admin. Comm'r*, No. 1:10-cv-00463-GZS, 2011 WL 4433660, at *5 (D. Me. Sept. 21, 2011) (it is the plaintiff's burden to supply the medical evidence needed to establish the degree to which her claimed impairments limit her functional capacity); *see also Davis v. Colvin*, No. 1:14-cv-343-JHR, 2015 WL 3937423, at *4 (D. Me. June 25,

2015) ("the important point here is that the plaintiff does not point to any evidence that there was any further limitation on her [functional] ability …, and the burden of proof rests with the claimant through the establishment of an RFC").

In making the RFC finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence …." (R. 22.) The RFC accounted for Plaintiff's muscle and joint pressure by including an hourly positional change limitation, suggesting that the ALJ did not discount all of Plaintiff's symptoms of fibromyalgia, but rather determined that fibromyalgia was not the source of the symptoms. (R. 22.) Plaintiff "neither points to [an] opinion … assessing greater restrictions than found by the [ALJ] nor … describes restrictions that should have been included." *Grivois v. Colvin*, No. 1:14-cv-68-JHR, 2015 WL 1757152, at *3 (D. Me. Apr. 17, 2015). Plaintiff thus has not demonstrated that a severe impairment finding as to Plaintiff's claimed fibromyalgia would result in any additional limitations on Plaintiff's work capacity.

### 2. Depression

The ALJ found Plaintiff's depression to be a medically determinable impairment but determined that it was not severe. (R. 19.) The ALJ noted that during the state agency consultative examination conducted by Fred Fridman, D.O., Plaintiff denied that she was receiving treatment from a psychiatrist, psychologist or counselor for her depression. (*Id.*, citing R. 664.) Plaintiff also informed Dr. Fridman that she was taking medication to treat her depression. At the administrative hearing, Plaintiff confirmed that she was not in counseling, and stated that no one had suggested that she should be. (R. 65-66.) She also

8

testified that she was taking medication for her depression and lower back pain. (R. 65.)

After her examination by Dr. Fridman, Plaintiff was evaluated by consultative examiner John Hale, Jr., Ed.D. (R. 668-72.) Dr. Hale conducted a mental status examination, and reported that Plaintiff was cooperative, seemed relaxed and comfortable, and remained engaged and involved during the interview. (R. 668.) He found Plaintiff's thoughts to be clear, logical and well-associated to the questions asked, and were linear and without disruptions in orientation or sensorium. (R. 668-69.) She displayed no disruption in concentration and both her long- and short-term memory appeared to be intact. (R. 669.) Plaintiff also showed no problem with language and was flexible and spontaneous in her affective expression. (*Id.*) The ALJ accorded "[s]ome weight" to Dr. Hale's opinion, particularly to his findings that Plaintiff had no significant deficits in her mental functioning. (R. 20.) The ALJ gave lesser weight to the Global Assessment of Functioning (GAF) score of 60 that Dr. Hale diagnosed for Plaintiff.[3] (*Id.*) The ALJ found no support to find Plaintiff has moderate restrictions in her mental functioning, and that Dr. Hale's assignment of that score was internally inconsistent with his own mental status examination of Plaintiff. (*Id.*)

State agency psychological consultants Robert Maierhofer, Ph.D., and Brian Stahl, Ph.D., both determined that Plaintiff's depression was a severe impairment. (R. 99, 115.) Dr. Maierhofer noted that Plaintiff's functioning appeared to be "fairly intact" from a cognitive perspective but "social deficits are evident." (R. 99.) Dr. Stahl confirmed that

---

[3] A GAF score of 60 signifies moderate symptoms or moderate difficulty in social or social occupational functioning. *See, e.g.,* https://www.webmd.com/mental-health/gaf-scale-facts.

assessment. (R. 115.) In his mental RFC assessment, Dr. Maierhofer found Plaintiff to be moderately limited in her ability to understand and remember detailed instructions, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. 104.) Dr. Maierhofer explained that Plaintiff's memory is intact for simple instructions and tasks, with no cognitive disruptions to her persistence or attention, and that she can interact with a small group of co-workers, but "less the general public." (R. 105.)

Dr. Stahl opined that Plaintiff did not have any understanding or memory limitations but was markedly limited in her ability to interact appropriately with the general public. (R. 120.) He also assessed Plaintiff as moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, but he found no significant limitation in her ability to get along with coworkers or peers. (R. 121.) Dr. Stahl explained further that Plaintiff "is able to work with coworkers and supervisors but not with the public." (*Id*.)

The ALJ gave "considerable weight" generally to the opinions of Drs. Maierhofer and Stahl but gave little weight to the specific portion of their opinions regarding the limitations in Plaintiff interacting with others because the opinions were based on Plaintiff's subjective reports rather than on objective observation. (R. 20.) The ALJ found that Plaintiff had no limitation in the functional areas of understanding, remembering, or applying information, or of concentrating, persisting, or maintaining pace. (R. 20-12.) The ALJ further found that Plaintiff had a mild limitation in the area of interacting with others,

noting that Plaintiff reported that she did not like to be around other people and did not socialize much with friends, but had a good rapport with providers and others, and was generally pleasant and cooperative. (*Id*.) The ALJ also assessed a mild limitation in the area of adapting or managing oneself. (R. 21.)

While an expert opinion is not essential to the assessment of whether an impairment is severe, *see, e.g.*, *Chretein*, 2017 WL 4613196, at *6, there is no medical evidence to contradict the opinions of Drs. Maierhofer and Stahl regarding Plaintiff's ability to interact with others. In fact, their opinion on the issue is consistent with Dr. Hale's findings. In this case, given the medical evidence that Plaintiff's depression impacts her ability to interact with the public, co-workers, and supervisors, and given the lack of contradictory medical evidence, the ALJ erred in concluding that Plaintiff did not satisfy the de minimus burden to establish that her depression constitutes a severe impairment.

The issue is whether Plaintiff can demonstrate prejudice. Both agency consultants included limitations in their respective mental RFC assessments relating to Plaintiff's depression, specifically as to her ability to interact with the general public.[4] At the administrative hearing, the ALJ asked the vocational expert whether an individual who "can interact with others on a superficial basis, but no requirement for intense social

---

[4] Defendant claims that the basic mental demands of unskilled work do not require interaction with the public, citing to Social Security Ruling 85-15, 1985 WL 56857. While SSR 85-15 does not list "interacting with the public" among the mental demands of unskilled work, 1985 WL 56857 at *4, it also provides that an unskilled cafeteria server who "almost constantly deal[t] with the public" but subsequently cannot because of a severe mental impairment, as an example someone who could appropriately be found disabled assuming further conditions are met. *Id*. at *5. Defendant also cites to 20 C.F.R. Pt. 404, Supt. P, App. 2 §§ 201.00(i) and 202.00(g), but neither provision states that unskilled or light work definitionally excludes jobs with significant interaction with the public.

11

demands[,] and can work in team or tandem with coworkers" could perform the identified jobs.  (R. 70.)  The vocational expert responded that the limitation would not affect Plaintiff's ability to perform her prior work as a cashier checker or the other jobs of merchandise marker, inspector and hand packager, and storage facility rental clerk because "the interaction with the public is routine in nature."  (*Id*.)  Upon further questioning regarding the effect of adding a requirement of no interaction with the public at all, the vocational expert responded that the storage facility rental clerk position would be eliminated (R. 71), as would, presumably, the cashier checker job.

In questioning the vocational expert, therefore, the ALJ included a limitation of no interaction with the general public even though the restriction was not included in the ALJ's RFC.  Because a person with that restriction could perform the remaining two jobs identified by the vocational expert,[5] the ALJ's failure to include the limitation in Plaintiff's RFC does not warrant remand.  *Bolduc v. Astrue,* No. 09–CV–220–B–W, 2010 WL 276280, at *4 n. 3 (D. Me. Jan. 19, 2010) ("[A]n error at Step 2 is uniformly considered harmless, and thus not to require remand, unless the plaintiff can demonstrate how the error would necessarily change the outcome of the plaintiff's claim.")).

**B.  RFC**

Plaintiff argues that the ALJ erred in establishing an RFC based on state agency medical opinions that were issued prior to the submission of material new evidence.

---

[5] The vocational expert testified that there are 270,000 merchandise marker positions in the United States economy, while there are 22,000 inspector and hand packager positions.  (R. 70.)  The Dictionary of Occupational Titles (DOT) provides that "taking instructions" and "helping" are "not significant" aspects of these jobs. *See* DOT No. 209.587-034 (Merchandise Marker), 1991 WL 671802; DOT No. 559.687-074 (Inspector and Hand Packager), 1991 WL 683797.

The ALJ gave great weight to the opinions of state agency medical consultants Paul Schraeder, M.D., and Archibald Green, D.O., noting that "both doctors had the opportunity to review the majority of the claimant's medical records during the applicable period of adjudication." (R. 25.) The ALJ adopted their respective physical RFC assessments, explaining that "their findings are supported by the medical evidence of record, which shows that the claimant has some deficits in her physical functioning, but not to the extent that she is unable to perform all work activities." (*Id.*) Plaintiff contends that because the state agency medical consultants did not review any medical records regarding Plaintiff's left shoulder condition after August 2016, the experts' opinions cannot constitute substantial evidence in support of the ALJ's RFC determination.

Generally, "a DDS non-examining expert's report cannot stand as substantial evidence in support of an administrative law judge's decision when material new evidence has been submitted [that] call[s] the expert's conclusions into question." *Eaton v. Astrue*, Civil No. 07-188-B-W, 2008 WL 4849327, at *5 (D. Me. Nov. 6, 2008). An ALJ may, however, rely on experts' reports despite later-submitted evidence when the new evidence "does not call into question their conclusions." *Emily A. v. Saul*, No. 2:19-cv-00071-JDL, 2020 WL 2488576, at *7 (D. Me. May 14, 2020). Where the unseen portions of the record "are merely cumulative or consistent with the preexisting record and/or contain evidence supportably dismissed or minimized by the ALJ," there is no material change in the record evidence that would call a consultant's conclusions into question. *Id.* (citing *Robert L. v. Berryhill*, No. 1:17-cv-00348-JDL, 2018 WL 3599966, at *6 (D. Me. July 27, 2018)).

Plaintiff reported to her surgeon in June and August of 2017, that she had persistent

13

left shoulder pain. (R. 833-32.) In September 2017 Plaintiff underwent surgical arthroscopy of the left shoulder with arthroscopic lysis of adhesions, a subacromial decompression and sub mini open subpectoral biceps tenodesis. (R. 824.) The ALJ summarized Plaintiff's postsurgical condition as follows:

> Two weeks after the surgery, [Plaintiff] reported that she was doing well, and weaning off pain medications, and the pain was well controlled. Another follow-up visit on December 11, 2017 presented [Plaintiff] was doing well following surgery, but still had some stiffness in the shoulder and pain anteriorly. Despite some issues reaching behind her back and felt like her shoulder was locking as she moved in and out of extension, she was slowly continuing to improve. A physical exam showed tenderness at the anterior portal site, 180 degrees of forward flexion, 160 degrees of abduction and could extend back to T6 with some discomfort. Additionally, she had good active elbow, wrist, hand, and finger range of motion. [Plaintiff] was in orthopedically stable condition and was treated with an injection into the left shoulder.

(R. 24.) At the December 11, 2017 visit, her surgeon noted that Plaintiff was "developing a bit of scar around her anterior portal site and that is causing some pulling and some pain." (R. 805.)

Although the ALJ acknowledged that the Plaintiff underwent surgery for her left shoulder impairment, "clearly suggesting that the symptoms were genuine," the ALJ found that that the records reflected the surgery was successful in relieving Plaintiff's symptoms, and that the left shoulder and right shoulder surgeries "achieved improvement to the point where [Plaintiff] could perform most activities." (R. 25.) After considering the records generated after Plaintiff's last date insured (December 31, 2017), the ALJ wrote, "a detailed analysis of those records is unnecessary because her condition was found 'not disabled' prior to the expiration of her date last insured." (R. 25.) The records suggest that Plaintiff's

left shoulder impairment did not improve following the surgery, with pain and resisted forward flexion and abduction, and required another surgery in June 2019.  (R. 780-82, 858.)  Defendant contends that because the state agency consultants were aware of Plaintiff's first left shoulder surgery in 2014 and had access to the July 2017 examination by Dr. Fridman, (R. 663-67), they were aware of the extent of Plaintiff's left shoulder impairment and thus the ALJ supportably relied upon the consultants' opinions.  Notably, the ALJ accorded Dr. Fridman's conclusions little weight, as he opined that there was no objective evidence of musculoskeletal, range of motion, gait, neurological, or functional abnormalities, which the ALJ found to be inconsistent with the other evidence of record.  (R. 26.)

The uncontroverted record establishes that the consulting experts did not review the medical records generated in 2017 as the result of the treatment of Plaintiff's shoulder, which treatment included surgery for a subacromial impingement and a biceps anchor tear.  Without the benefit of an expert opinion, the ALJ reviewed the records and concluded that the surgery was generally successful in relieving Plaintiff's symptoms and observed that after each shoulder surgery, Plaintiff was able to perform most activities.  (R. 25.)

Although an ALJ is not precluded from "rendering common-sense judgments about functional capacity based on medical findings," an ALJ "is not qualified to assess [RFC] based on a bare medical record[,]"  *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990).  The ALJ interpreted the surgical records and the post-surgery records to reflect minimal, if any, impact on Plaintiff's functional ability.

The issues are whether Plaintiff's subsequent surgeries and the related treatment

15

would alter the opinions of the state agency consultants and whether the ALJ, as a layperson, had the expertise to assess the potential impact of the subsequent developments on the consultants' opinions and ultimately Plaintiff's functional ability. The subsequent medical records demonstrate that Plaintiff continued to have problems with the shoulder that were significant enough to require two surgeries. Because the consultants did not review the records generated just before and after the September 2017 surgery and because Plaintiff later required yet another surgery, the subsequent evidence "calls into question" the conclusions of the state agency consultants. *Emily A.*, 2020 WL 2488576, at *7. Without additional expert evidence, the ALJ could not permissibly assess the evidence and determine the extent, if any, of the impact of the evidence on the consultants' opinions and Plaintiff's functional ability. Accordingly, remand is warranted.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court vacate the administrative decision and remand the matter for further proceedings.

## **NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

Dated this 19th day of August, 2021.

/s/ John C. Nivison
U.S. Magistrate Judge